Helen Kiansky KAMEN, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–07–00589–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

Nov. 5, 2009.

Rehearing Overruled Feb. 18, 2010.

Michael C. Diaz, Richmond, TX, for Helen Kiansky Kamen.

John Healey, Richmond, TX, for The State of Texas.

Panel consists of Chief Justice RADACK and Justices ALCALA and HANKS.

## OPINION ON REHEARING

GEORGE C. HANKS, JR., Justice.

A jury convicted appellant, Helen Kiansky Kamen, of driving while intoxicated. *See* TEX. PENAL CODE ANN. § 49.04 (Vernon 2003). The trial court assessed punishment at 180 days in jail, probated for 15 months, plus additional fines, fees, and community service. We issued our memorandum opinion on May 7, 2009, affirming the conviction. Appellant has filed a motion for rehearing arguing that this Court erred in holding that the trial court did not abuse its discretion in denying appellant's motion to suppress testimony regarding the HGN test administered after her arrest. We deny appellant's motion for rehearing. We do, however, withdraw our previous opinion in this case and issue the following in its stead.

We affirm the judgment of the trial court.

### Background

At approximately 2:30 a.m. on March 20, 2004, Texas Department of Public Safety Trooper Thomas Radford saw a car accident in the southbound lanes of U.S. Highway 59 in Sugar Land and stopped to assist the Sugar Land Police Department with traffic control. Using burning road flares and their patrol cars, the officers set up a "safety zone" around the accident, which had occurred in the center lanes of the five-lane freeway. While the accident was being cleared, a Sugar Land police officer wearing a reflective vest used a traffic direction flashlight to direct traffic around the safety zone.

During the investigation, Radford testified, another officer "kind of yelled out to [him], 'Look out' or 'Get out of the way' " and a car drove into the safety zone, stopping just inside of it. Radford testified that he then approached the vehicle because "no [other] vehicle had ever gotten that particular [sic] close to us." Radford testified that he asked appellant, who was driving the car, if she was okay and that appellant did not respond. Radford then asked a second time, to which appellant responded "that she was fine and she was on her way home." Because appellant appeared "disoriented or confused" and had a "blank ... look on her face," Radford asked appellant to get out of the vehicle. Radford took appellant to his police vehicle and began asking her questions.

Radford testified that appellant's speech was slurred, that she smelled of alcohol, that she admitted to drinking "some wine" earlier that evening, and that she refused

to submit to a portable breath test. Because he and appellant were in the middle of the highway, Radford testified, he did not have appellant perform any field sobriety tests. Radford placed appellant under arrest.

During the investigation and arrest, Radford testified, appellant was "angry" and "a little violent." He testified that she "yelled" at him, "cried," "used profanity," and kicked the camera in Radford's patrol car. When Radford informed appellant that she was under arrest, appellant "refused to get out of [Radford's] vehicle[,]" requiring Radford to "forcefully take her out of the vehicle to handcuff her."

Radford drove appellant to Fort Bend County Jail, where appellant agreed to attempt a battery of field sobriety tests but again refused to provide a breath sample. Radford administered five field sobriety tests: the horizontal gaze nystagmus ("HGN") test, which checks for involuntary eye movement by directing a subject to follow a stimulus (usually a pen or a light) with her eyes; the walk-and-turn test, which requires the subject to take nine steps heel-to-toe while counting out loud, then turn 180 degrees and repeat the process in the other direction; the one-leg stand test, which requires the subject to hold the foot of her choice six inches off the ground, look at it, and count "one thousand one, one thousand two," and so on until instructed by the officer to stop; the Rhomberg balance test, which requires the subject to stand still with his head tilted back and his eyes closed and count silently to 30; and the alphabet test.

Radford testified that, when he administered the HGN test, he observed "lack of smooth pursuit" and "distinct nystagmus at maximum deviation" in both of appellant's eyes, and that appellant displayed four out of a possible six clues of intoxication during the test. During the walk-and-turn test, Radford testified appellant exhibited six out of a possible eight clues—she failed to maintain her balance while Radford explained the test; began before she was instructed to; stopped while walking; failed to remain heel-to-toe; made an improper turn; and took ten steps instead of nine. During the one-leg stand test, appellant displayed one out of four possible clues—a slight sway. During the Rhomberg test, appellant gauged 22 seconds as being 30 seconds and swayed back and forth. Lastly, when Radford asked appellant to say the alphabet, she could not recite the alphabet in English and he agreed to let her recite the alphabet in Russian rather than English. Radford testified that, based on the totality of the circumstances, he believed that appellant was intoxicated.

At trial, appellant and a friend, Gregory Olszewski, both testified that appellant drank two glasses of wine with dinner and a smaller glass of wine afterward at a friend's apartment. Appellant testified that she ordered her first glass of wine at about 10 p.m. and left her friend's apartment at about 2 a.m. Appellant further testified that she drove straight toward the accident safety zone because heavy traffic on both sides prevented her from changing lanes. She admitted to being "very mad and very upset" at the time of her arrest because she "had a lot of things going on in [her] personal life" and "just snapped." During cross-examination, appellant did admit that she failed to recite the entire Russian alphabet as requested. However, appellant denied being intoxicated.

A videotape of appellant's arrest, beginning from the time she was placed into Radford's vehicle at the scene of the stop and lasting through the administration of sobriety tests at the police station, was admitted into evidence and played for the jury.

## Motion to Suppress

In her first issue, appellant contends that the trial court erred in denying her motion to suppress the results of the HGN test because "the HGN test was not administered in accordance with the National Highway Traffic Safety Administration (NHTSA) protocol."

## Standard of Review

We review a trial court's ruling on a motion to suppress evidence for an abuse of discretion. *State v. Dixon,* 206 S.W.3d 587, 590 (Tex.Crim.App.2006). We review the record in the light most favorable to the trial court's conclusion. *Id.* We will sustain the trial court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case. *Id.* We give almost total deference to the trial court's determination of historical facts and review *de novo* the trial court's application of the law to those facts. *Id.*

When, as in this case, the trial court fails to file findings of fact, we view the evidence in the light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact that support its ruling as long as those findings of fact are supported by the record. *State v. Ross,* 32 S.W.3d 853, 855 (Tex.Crim.App.2000).

## The HGN Test

On appeal and rehearing, appellant argues that evidence from the HGN test was inadmissible and unreliable because Trooper Radford did not administer the HGN test in accordance with NHTSA protocol. Specifically, she argues that Radford took only eight seconds to administer the smooth pursuit phase of the test, while NHTSA protocol requires approximately 16 seconds; that Radford ignored her complaint that she could not see the stimulus during the smooth pursuit phase; and that Radford did not readminister the maximum deviation phase when appellant moved her head. Accordingly, she argues that the trial court erred by admitting evidence regarding the HGN test administered by Radford and its results.

The evidence is undisputed that Radford was certified to perform the HGN test. Further, appellant does not dispute that Radford conducted the pre-screening portion of the HGN test correctly by determining that appellant did not have any ailments that might affect the test, checking for pupil size and tracking, having appellant stand in the correct position, and holding the stimulus at a proper distance from appellant's eyes. Instead, her complaint on appeal relates to the portions of the test that resulted in the two positive clues from the distinct nystagmus at maximum deviation and two positive clues from the lack of smooth pursuit of the eyes.

### 1. Maximum Deviation

Radford testified that he found two clues, one for each eye, for the portion of the HGN test that checks nystagmus at maximum deviation.[1] He said he held the

1. "Horizontal gaze nystagmus (HGN) refers to a lateral or horizontal jerking when the eye gazes to the side. In the impaired driving context, alcohol consumption or consumption of certain other central nervous system depressants, inhalants or phencyclidine, hinders the ability of the brain to correctly control eye muscles, therefore causing the jerk or bounce associated with HGN.... This is assessed in the horizontal gaze nystagmus test." *See* http://www.nhtsa.dot.gov/people/injury/enforce/nystagmus/hgntxt.html. During the HGN test, an officer asks the suspect to follow an object, such as a stylus or pen, with their eyes and observes whether the subject's eyes track the object smoothly. *Id.* "Maximum deviation" refers to the portion of the test in which, starting from the center of the suspect's face, the officer moves the object toward the left ear, bringing the eye as far over

stimulus the proper time of four seconds at maximum deviation.

■ During the hearing on her motion to suppress the results of the HGN test, appellant's expert testified that Radford should not have counted the two clues from the maximum deviation part of the test because appellant was moving her head and was not able to maintain visual fixation on the stimulus. This, according to the expert, compromised the validity of the test. However, appellant's expert acknowledged that Radford held the stimulus at the maximum point for the correct amount of time in accordance with the NHTSA standard. Appellant's expert also agreed appellant "possibly could be intoxicated" based on the jerking in the eyes at maximum deviation. Further, appellant's expert testified that he could say, despite the deviations he identified in the testing protocol, that appellant demonstrated signs of "alcohol consumption to the point where the small muscles of the eyes have been affected by a depressant." Because we must view the record in a light most favorable to the trial court's ruling, we hold the trial court did not err by determining Radford performed the maximum deviation portion of the HGN test correctly. These two clues, therefore, were properly admitted.

## 2. Smooth Pursuit of Eyes

During the hearing on the motion to suppress, Appellant's expert testified that Radford moved the stimulus too quickly because the test should take 16 seconds to complete. Appellant's expert based this opinion upon the videotape of Radford performing the HGN test on appellant. The stimulus is not visible on the videotape,

although the tape does record the movements of appellant's eyes. Despite the fact that the stimulus does not actually appear on the videotape, appellant's expert testified that Radford moved the stimulus too rapidly and in half the required time and that this was "not in accordance with the standards."

Radford agrees that he did not take 16 seconds to move the stimulus. He testified that he checked appellant's eyes by holding the stimulus in front of appellant's eyes, one at a time. He moved the stimulus from right to left as he watched her eyes. He said the time to move the stimulus across each eye is "about a two-second pass." This means that two passes to each eye would equal a total of eight seconds. Radford testified appellant "had a hard time keeping her head still" so he had to start over a few times.

Taking the evidence in the record, it is undisputed that Radford took eight seconds to perform the test. The dispute on appeal is the application of the law to the question of whether the trial court could properly have determined that eight seconds was sufficient to make the smooth pursuit portion of the test reliable evidence for the jury.

The Texarkana Court of Appeals has held that, although they may affect the weight to be given the testimony, slight variations in the administration of the HGN test do not render the evidence inadmissible or unreliable. *Compton v. State*, 120 S.W.3d 375, 378 (Tex.App.-Texarkana 2003, pet. ref'd); *see also Plouff v. State*, 192 S.W.3d 213, 221 (Tex.App.-Houston [14th Dist.] 2006, no pet.) ("We agree with the conclusion in *Compton* that it

as possible, and holds the object there for four seconds. *Id.* The officer notes an impairment clue if there is a distinct and sustained nystagmus at this point. *Id.* The officer holds the

object at maximum deviation for at least four seconds to ensure that quick movement of the object did not possibly cause the nystagmus. *Id.*

would be unreasonable to conclude that any variation in administering the tests, no matter how slight, could automatically undermine the admissibility of an individual's performance of the tests."). Appellant contends that the Texarkana Court's holding in *Compton* contradicts the holding of the Court of Criminal Appeals in *Emerson v. State*, 880 S.W.2d 759, 764–69 (Tex. Crim.App.1994), which established the admissibility requirements for testimony concerning a defendant's performance on the HGN test, and that the facts of this case concern a more extreme deviation from the testing standards than in *Compton* and thus the test should have been excluded.

**Harm Analysis**

Appellant's brief and motion for rehearing urges us to hold that the HGN test as administered in this case deviated from acceptable norms and was thus unreliable and inadmissible, and she asks that we reverse in her favor on these grounds. Appellant's motion for rehearing argues that the arrest was made on "ambiguous driving facts as well as ambiguous facts allegedly indicating intoxication." Further, appellant argues that her performances on other field sobriety tests were "consistent with sobriety" and that she "presented affirmative evidence that she was not intoxicated." Appellant's briefing casts the HGN test in a crucial role, and implies that, but for the introduction of the HGN test and its results into evidence, the jury would not have found her to be intoxicated.

After reviewing all the evidence presented at trial, we disagree. Even if we were to conclude that the trial court erred by admitting testimony or evidence regarding the two clues for lack of smooth pursuit of the eyes in the HGN test, that error would be non-constitutional in nature and subject to analysis under Rule 44.2(b). Tex.R.App. P. 44.2(b).

Non-constitutional error must be disregarded unless it affects substantial rights of the defendant. *Johnson v. State*, 43 S.W.3d 1, 4 (Tex.Crim.App.2001). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim.App.1997). A conviction should not be overturned for such error if this Court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect. *Johnson v. State*, 967 S.W.2d 410, 417 (Tex.Crim.App.1998). Likewise, improper admission of evidence is not reversible error if the same or similar evidence is admitted without objection at another point in the trial. *Leday v. State*, 983 S.W.2d 713, 718 (Tex.Crim.App.1998).

The State argues that the overwhelming evidence of Kamen's guilt renders any error harmless. Although overwhelming evidence of guilt is a factor to consider in a harm analysis, it is not the only factor; other factors include the nature of the evidence supporting the verdict, the character of the alleged error, and how the evidence might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 356 (Tex.Crim.App. 2002).

Here, the evidence supporting Kamen's guilt included her through and into a safety zone marked by road flares at night; Radford's testimony that she seemed disoriented and smelled of alcohol when he first encountered her; her refusal of a breath test at the scene; her sustained verbal abuse of Radford and repeated refusal to cooperate with Radford's requests during her stop and arrest; her repeated tampering with and kicking the camera in Radford's vehicle; her slurred speech; her fluctuating moods—ranging from belligerent to morose and back again; her admit-

ted consumption of alcohol that night; and other clues noted by Radford while performing the various field sobriety tests long after the initial stop, including her inability to recite the English alphabet despite her demonstrated fluency in English,[2] her admitted failure to recite the entire Russian alphabet,[3] her inability to complete the walk-and-turn test as instructed the first time, and her swaying during the Rhomberg and other tests. While much of this evidence was attested to by Radford during his testimony, the videotape published to the jury provided corroborating and independent evidence upon which the jury could have rested its determination that Kamen was intoxicated.

A review of the entire trial shows that the HGN test described by Radford and seen being administered on the video was simply one of a long series of transactions between Kamen and Radford and a small part of the State's case against Kamen. For example, the State did not specifically mention the HGN test in its opening, instead making only a passing reference to "field sobriety tests." Rather, it was the defense, in its opening, who first made mention of "eye tests" administered to Kamen. During cross-examination, Radford testified that the HGN test was just "one of the tools" he used to determine whether a person was intoxicated.

> Q [Kamen's attorney]: ... And you don't arrest a person just after doing an HGN, do you?
>
> A [Radford]: No, sir.

Q: Okay. It's just simply one of the tools that factors into whether or not you've answered the question as to whether you have probable cause to put a person under arrest; right?

A: Yes, it could be. It is one of my tools that I use to determine whether or not a person's intoxicated, yes.

Similarly, the HGN test comprises a very small part of the videotaped interactions between Kamen and Radford, which begin when Kamen is initially placed in the patrol vehicle, continue while she is being transported to the Fort Bend County Jail, and end well over an hour later after she performs various field sobriety tests. During closing, after reviewing the initial stop and the aggressive and uncooperative behavior Kamen exhibited in Radford's vehicle on the way to the jail, the State briefly reviewed the HGN test administered in this case. However, rather than focusing specifically on the HGN test, or any single field sobriety test, the State's closing focused on Kamen's inability to follow instructions during the administration of all of the field sobriety tests and her overall behavior during the evening. While the HGN test was mentioned during the State's closing, far more weight was given to Kamen's general demeanor as demonstrated on the videotape published to the jury, inconsistencies in her testimony, her failure to follow instructions, and her driving into a safety zone marked at night by roadside flares. Furthermore, of the six possible clues that comprise the HGN test, Radford testified Kamen had

---

**2.** At trial, Kamen testified that, although English was not her first language, she had received both a bachelors and masters degree while in Houston.

**3.** At trial, Kamen first contended that she had recited the entire Russian alphabet when requested to do so. On cross-examination, however, she admitted that the Russian alpha-

bet has 32 characters and that she had recited "about half."

> [State]: And its correct that the Russian alphabet has 33 characters?
>
> [Kamen]: Thirty-two.
>
> [State]: And you only did about half of that? You couldn't even complete the Russian alphabet? Correct?
>
> [Kamen]: Correct.

only four clues and, of those four clues, we have determined that two of the clues resulted from a maximum deviation test that was properly performed.

After reviewing the entire record, we hold that any error the trial court may have committed in admitting the results of the two clues for the smooth pursuit part of the HGN test did not have a substantial and injurious effect or influence in determining the jury's verdict and, thus, did not affect any of Kamen's substantial rights. *See King*, 953 S.W.2d at 271. Accordingly, we overrule Kamen's issue.

### Factual Sufficiency

In her second issue, appellant contends that the evidence supporting her conviction is factually insufficient.

#### Standard of Review

When conducting a factual-sufficiency review, we view all of the evidence in a neutral light. *Ladd v. State*, 3 S.W.3d 547, 557 (Tex.Crim.App.1999). We will set the verdict aside only if (1) the evidence is so weak that the verdict is clearly wrong and manifestly unjust or (2) the verdict is against the great weight and preponderance of the evidence. *Johnson v. State*, 23 S.W.3d 1, 11 (Tex.Crim.App.2000). Under the first prong of *Johnson*, we cannot conclude that a conviction is "clearly wrong" or "manifestly unjust" simply because, on the quantum of evidence admitted, we would have voted to acquit had we been on the jury. *Watson v. State*, 204 S.W.3d 404, 417 (Tex.Crim.App.2006). Under the second prong of *Johnson*, we cannot declare that a conflict in the evidence justifies a new trial simply because we disagree with the jury's resolution of that conflict. *Id.* Before finding that evidence is factually insufficient to support a verdict under the second prong of *Johnson*, we must be able to say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the jury's verdict. *Id.* In conducting a factual-sufficiency review, we must also discuss the evidence that, according to the appellant, most undermines the jury's verdict. *Sims v. State*, 99 S.W.3d 600, 603 (Tex.Crim.App.2003).

A jury is in the best position to evaluate the credibility of witnesses, and we are required to afford "due deference" to the jury's determinations. *Marshall v. State*, 210 S.W.3d 618, 625 (Tex.Crim.App.2006). The jury is free to accept or to reject any or all of the evidence presented by either side. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex.Crim.App.1991). Reconciling conflicting testimony is within the exclusive province of the jury. *Goodman v. State*, 66 S.W.3d 283, 287 (Tex.Crim.App.2001).

#### The Evidence

Radford testified that appellant drove into, rather than around, a clearly marked safety zone. Radford further testified that, during his initial investigation, appellant seemed confused, slurred her speech, smelled like alcohol, admitted to drinking wine earlier that night, refused to submit to a portable breath test, yelled obscenities, cried, kicked the camera in Radford's patrol car, and refused to exit the patrol car so that Radford could handcuff her.

At the police station, according to Radford's testimony, appellant again refused to provide a breath sample. Radford additionally testified that appellant exhibited four of six possible clues on the HGN test, six of eight possible clues on the walk-and-turn test, and one of four possible clues on the one-leg-stand test. Appellant also gauged 22 seconds as 30 seconds and swayed back and forth during the Rhomberg test. When Radford asked her to perform the alphabet test, appellant was unable to recite the English alphabet and

requested to recite the Russian alphabet instead. At trial, appellant first contended she recited the entire Russian alphabet, but shortly thereafter conceded that she had recited only "half."

Appellant's friend, Gregory Olszewski, and appellant both testified that appellant drank two glasses of wine with dinner and a smaller glass of wine later that night at another friend's apartment.

Appellant argues that Radford mischaracterized appellant's performance on the field sobriety tests; that appellant, who is a native of Russia, has a strong accent, which explains why Radford thought that her speech was slurred; that appellant was prevented from avoiding the accident safety zone by heavy traffic on both sides; and that appellant's confusion, aggressive conduct, and recital of the wrong alphabet stemmed not from intoxication but from the unusual and stressful circumstances.

The jury has the sole province to decide what weight is to be given to contradictory testimony, as it turns on an evaluation of credibility and demeanor. *Cain v. State*, 958 S.W.2d 404, 408–09 (Tex.Crim.App. 1997). The jury is free to believe some, all, or none of the testimony of a witness, and the jury's decision is not manifestly unjust because it has resolved conflicting views of evidence in favor of the State. *Id.* at 409–10. Hence, the jury was free to discredit appellant's trial testimony and believe that of Radford, and the jury was also free to resolve any conflict in the evidence in favor of the State. In particular, the jury had an opportunity to observe appellant's speech and demeanor on the videotape and during her testimony at trial, and to determine whether the videotape provided evidence corroborating Trooper Radford's account that appellant appeared to be intoxicated on the evening in question. Appellant does not show how the jury's verdict was clearly wrong, manifest-

ly unjust, or against the great weight and preponderance of the evidence. *Johnson*, 23 S.W.3d at 11. We overrule appellant's second issue.

## Conclusion

We affirm the judgment of the trial court.